## In re TIDEWATER MEMORIAL HOSPITAL, INC., Debtor.

### Bankruptcy No. 88–01656–RT.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Oct. 11, 1989.

Augustus C. Epps, Jr., Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for Tidewater Memorial Hosp. Inc., debtor.

C. Carter Wailes, Richmond, Va., for creditor.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

In this chapter 11 case, Tidewater Memorial Hospital, Inc., debtor-in-possession, objected to the proof of claim of David H. Taylor, M.D. A hearing was held on the objection at which the Court received evidence and heard testimony of Dr. Taylor and also of Louise Osborne, who was the hospital's president during the period involved in the controversy and who negotiated a contract between the parties that forms the basis of Dr. Taylor's claim.

For reasons stated in this opinion, the Court sustains the debtor's objection to the claim, and the claim will be denied.

*Facts*

Dr. Taylor timely filed a proof of claim in this case in the total amount of $42,845.90 consisting of the following:

| | | | |
|---|---|---|---|
| Wages (5 × $6,250.00) | | | $31,250.00 |
| Expenses | Travel | $2,050.90 | |
| | Consultant's Fees | $1,650.00 | |
| | Equipment Rental | $4,000.00 | $ 7,700.90 |
| Interest | | | $ 3,895.00 |
| Total | | | $42,845.90 |

---

The claim is unsecured.[1] Attached to the claim was a copy of a document entitled "Physician Practice Support Agreement" dated November 22, 1986, between the hospital and Dr. Taylor. This nine page document embodied the contract upon which the claim is based.

The debtor's counsel filed an objection to the claim "on the grounds that the claimant has no valid claim against the Debtor."

In summary, the contract provided: (1) that Dr. Taylor, who had been in medical practice in Elizabeth City, North Carolina, would establish his practice in Tappahannock, Virginia, where Tidewater Memorial Hospital is located; (2) that for a term of one year commencing January 1, 1987, Dr. Taylor was to be available to the hospital as an independent contractor specializing in internal medicine; and (3) that the hospital would assist Dr. Taylor financially to establish his practice; this assistance included the hospital's purchase of medical and office equipment for the physician's use, reimbursement of moving and other expenses and a guaranteed monthly income of $6,250.00.

Other pertinent provisions of the agreement included the following:

4. *Credentials.* Doctor shall apply for and maintain his right to medical staff privileges at the Hospital. The Hospital agrees to consider, promptly after submission, all credentials of the Doctor necessary for admittance as a member of the staff of the Hospital and, if permitted, shall accord to Doctor all privileges and benefits provided for in its Medical Staff Bylaws.

5. *Practice.* Doctor shall locate his medical practice at a mutually agreeable location and shall maintain his practice at such location during the term of this Agreement. Doctor agrees to practice at such location on a full-time basis during the term of this Agreement

.      .      .      .      .

7. *Additional Assistance.*

(b) If available, the Hospital shall provide Doctor with rent-free office space during the term of this Agreement to include utilities and office set-up costs (including moving expenses).

11. *Insurance.* Doctor shall maintain at all times during the term of this Agreement professional liability and malpractice insurance in amounts reasonably satisfactory to Hospital and with an insurance company reasonably acceptable to Hospital....

12. *Termination.* Hospital may terminate this Agreement upon thirty days written notice if Doctor: (i) fails to obtain or maintain staff privileges at the Hospital, (ii) fails to continue the practice of medicine at the location agreed to pursuant to Section 5 hereof, (iii) changes the status in which he practices medicine, (iv) loses his license to practice medicine,

---

1. The wages claimed are for the months January through May, 1987. Although the claim stated that the wage portion was entitled to priority, at hearing Dr. Taylor's counsel acknowledged that the claim does not qualify for priority treatment.

or (v) materially breaches any covenant or provision of this Agreement....

In substance, the intent of the agreement was for the hospital to financially assist Dr. Taylor in relocating his medical practice from North Carolina to Tappahannock so that the hospital would have his services as a specialist in internal medicine.

In fact, although Dr. Taylor had given up his North Carolina practice by January 1, 1987, he never commenced a medical practice in Tappahannock. In considering the hospital's objection to the claim filed by Dr. Taylor, the Court must determine which party was responsible for the failure of the contract.

It is basic to Dr. Taylor's claim that he is entitled to partial payment under the contract notwithstanding his failure to relocate and maintain a medical practice in Tappahannock as appears to be required by paragraph 5 of the agreement. There are two principal areas of dispute: (1) The delay in the hospital's granting Dr. Taylor staff privileges necessary for his practice at the hospital, and whether his entitlement to payments under the contract was conditioned upon his first having received staff privileges; and (2) The availability (or nonavailability) of suitable office space for Dr. Taylor's medical practice.

### Position of Parties

The divergent positions of the parties, which are revealed primarily in the testimony at hearing of the witnesses, Dr. Taylor and Louise Osborne, may be summarized as follows:

#### Dr. Taylor's Position

Staff Privileges. He signed the agreement in November 1986 and made plans to move his medical practice to Tappahannock. Realizing the importance to his agreement of receiving hospital staff privileges, he promptly submitted the requested credentials information to the hospital credentials committee. In December 1986, he received and complied with a request from the committee for additional credentials information relative to his staff privileges. Prior to the end of 1986 he was verbally offered temporary staff privileges which he did not accept because they were not in writing and were only temporary; also, he testified he was not certain what staff privileges were then being offered. He was given hospital staff privileges around the first of April; the specific privileges granted were set out in Ms. Osborne's letter to him dated April 22, 1987.[2] [Debtor's Exhibit 1] He found these privileges acceptable.

Office Space. In January 1987, the hospital was renovating existing office space near the hospital for Dr. Taylor's use. In the interim, the hospital offered him other space, but Dr. Taylor found this space inappropriate, primarily because he considered it too small for his intended practice. As an example of why the space was too small, Dr. Taylor stated that if a patient were to have a heart attack while in his office, there would not have been enough room in the examining room for necessary emergency equipment.

When Dr. Taylor learned he was being granted staff privileges in April, he began to interview prospective staff for his practice, but the space being renovated was still incomplete, and he was unable to locate other suitable office space.

Dr. Taylor did not move his family to Tappahannock, nor did he open a medical practice. In his view, the hospital had failed to comply with the contract by refusing to pay his guaranteed salary and expenses and by failing to obtain for him a Medicare provider number or pay his medical malpractice insurance premiums. As a result of these continuing violations, Dr. Taylor notified the hospital by letter dated June 10, 1987, of his termination of the agreement. [Debtor's Exhibit 3] In this letter Dr. Taylor listed his complaints against the hospital, primarily relating to the hospital's refusal to pay his salary.

---

**2.** The letter of April 22 states that the hospital's board of trustees approved the privileges on April 15, 1987, as recommended by the administrative affairs committee. Dr. Taylor testified that he learned the privileges had been approved by the committee around the first of April.

With respect to his refusal to commence his medical practice on January 1, 1987, as provided by the agreement, he stated as follows:

> To preclude any comments that I was just concerned with money, let us set the record straight. If interested in a short term career at Tappahannock and a lot of money, I would have moved to Tappahannock 1/1/87 to start an ill prepared practice with little hope of long-term success ... yet I would have received a substantial guaranteed sum of money regardless of failure. I was morally and ethically not able to take advantage of you that way. On the other hand, if I was interested in a successful long-term practice in Tappahannock and not immediate financial gains, I would have waited til the building blocks for a successful practice were in place, e.g. *hospital privileges and mutually agreed upon office space.* The record is clear as to the approach I favored. (emphasis supplied)

Dr. Taylor claims that his monthly salary (guaranteed income) should be paid from January through May, 1987, after which he voluntarily withdrew due to the hospital's failure to comply with the terms of the contract.

*Debtor's Position*

Staff Privileges. The hospital, having a need for a physician who was board certified in internal medicine, sought the services of Dr. Taylor who was so qualified. The contract of November 22, 1986, specifically provided that he was to specialize in internal medicine. After the contract was entered and when Dr. Taylor submitted his credentials to the hospital, he sought staff privileges not only as an internist but also in gastroenterology, a subspecialty of internal medicine. Dr. Taylor was not board certified in this subspecialty.

The hospital's credentials committee was willing to consider granting staff privileges to Dr. Taylor in the subspecialty, but because he had not been certified for this discipline the committee required the additional information which was requested in December 1986. While this matter was pending, Ms. Osborne prior to January 1, 1987, verbally offered Dr. Taylor temporary (120 · days) hospital staff privileges which would allow him in the interim to practice in his specialty of internal medicine. Dr. Taylor declined to commence practice under the temporary privileges offered at that time because gastroenterology practice had not been included.

According to Ms. Osborne, the staff privileges given Dr. Taylor, which were specified by her in the letter of April 22, 1987, were the same privileges he had previously been verbally offered; by this letter he was not given staff privileges as a gastro subspecialist because the credentials committee did not consider him qualified for this practice.

Office Space. At the time the parties entered the contract, a new office building with space to be allocated to Dr. Taylor's use was in the drawing stage and would not be available for some time. For the interim the hospital agreed to renovate existing space for Dr. Taylor. However, although work on this space had commenced, both parties knew that the renovation would not be complete by January 1, 1987. While this renovation was under way, the hospital offered Dr. Taylor other space which he declined as inappropriate. According to Ms. Osborne, this latter space offered for Dr. Taylor's use was suitable for the practice of internal medicine and had in fact previously been used by a physician for this type of practice; Dr. Taylor refused the space only because he considered it not suitable for his desired subspecialty, gastroenterology.

Because Dr. Taylor made no effort to move to Tappahannock or to begin his practice of internal medicine as required by the contract, the hospital refused to pay his salary or reimburse his expenses. The hospital did not pay malpractice insurance premiums for him because the obtaining of this insurance was contingent upon the physician receiving hospital staff privileges; this was also true of the Medicare provider number.

*Discussion And Conclusions*

While the filing of a proof of claim under § 501 of the Bankruptcy Code may be prima facie evidence of the claim, upon objection the creditor has the ultimate bur-

den of proof to establish the validity of the claim by a preponderance of the evidence. 3 King, *Collier On Bankruptcy*, par. 502.-01[3] (15th Ed., 1989).

■ The Court is confronted in the dispute over Dr. Taylor's claim with the conflicting testimony of two seemingly credible witnesses. Since there appears to be merit on both sides, it is unfortunate that the parties could not have reached a settlement of the claim.

It seems beyond question that the contract required Dr. Taylor to relocate and commence his medical practice in Tappahannock. His failure to do so precludes any recovery by him under the contract unless he can establish that he was excused from commencing practice under other provisions of the contract. As related above, the excuses Dr. Taylor relies upon concern staff privileges and office space.

The substance of Dr. Taylor's testimony is that he was ready to begin practice whenever he was given appropriate staff privileges and suitable office space. He had declined the verbal, temporary privileges offered him before January 1, 1987; however, he testified that he had accepted the staff privileges offered him in April and specified by Ms. Osborne's letter of April 22, 1987. These privileges did not include the subspecialty of gastroenterology.[3] Ms. Osborne testified that Dr. Taylor had refused the staff privileges set out in the letter of April 22; no documentation of his acceptance or refusal of these privileges has been presented. With respect to office space, Dr. Taylor apparently never found any space which he considered acceptable.

It is significant that Dr. Taylor has not asserted any impropriety on the hospital's part due to the time required for the formal granting to him of staff privileges in April. Rather, it seems to be his position that he was entitled to the monthly guaranteed income payments beginning January 1, 1987, regardless of the status of his staff privileges or whether he had commenced practice under the contract.

The debtor's position is simple. Since Dr. Taylor never commenced his medical practice as required by paragraph 5 of the contract, he is not entitled to any payment.

The Court rejects Dr. Taylor's contention that he was entitled to contract payments before he was given hospital staff privileges. While the contract might have been more explicit, the Court finds that the hospital had no obligation to comply with any payment provisions of the contract until Dr. Taylor at least qualified for and was given staff privileges. Only then could he be insured for malpractice, a contract requirement, or receive a Medicare provider number which was also essential to his practice. Considering all the evidence, the Court is left with the impression that any delay by the hospital's credentials committee in granting formal staff privileges was caused by Dr. Taylor's desire to be certified in a subspecialty for which he was unqualified and which was not part of his contract. But even assuming this was not the case, the evidence does not suggest the delay was unreasonable or unwarranted.

Therefore, since Dr. Taylor did not receive staff privileges until April, the Court concludes that the hospital had no contractual obligation for payments to Dr. Taylor prior to April 1987.

■ This leaves the question of whether Dr. Taylor was entitled to payments but contractually excused from opening his medical practice in April after receiving privileges on the basis that no reasonably suitable space was then available for his use. Paragraph 5 of the contract provided for Dr. Taylor to locate his practice "at a mutually agreeable location". In effect, the parties never agreed upon a location. Dr. Taylor contended in testimony that no acceptable space was available, a contention not satisfactorily established by the conflicting evidence. The debtor's evidence was that (1) space suitable to an internal medicine practice was offered to Dr. Taylor but rejected, and (2) if the space offered was unsuitable to Dr. Taylor it was because he had injected a new requirement

---

**3.** Although Ms. Osborne's letter stated Dr. Taylor was given staff privileges for the treatment of "gastrointestinal" disease, it appears from the evidence this was a limited privilege applicable to internal medicine and did not include gastroenterology as such.

**890**

not contemplated by the contract, the gastro subspecialty.

The evidence does establish that the hospital by its actions agreed to renovate space which Dr. Taylor claims would have been suitable for his use in the subspecialty and that this space was not ready for his use when he was given hospital privileges in April. (Although Dr. Taylor at some point suggested that he rent space in downtown Tappahannock, he says he did not do so because the hospital wanted him to locate closer to the hospital.)

The question at this point then is whether the hospital's undertaking to renovate space acceptable to Dr. Taylor, combined with his reliance upon the availability of this space, effected a modification of the contract which required the hospital to have this particular space available within a reasonable time. If so, the hospital's failure to have the space renovated by April might be regarded as a breach of the agreement at that time.

Possibly the contract was so modified. However, Dr. Taylor has not urged this, and the evidence on the point is so vague that the Court would have to indulge in speculation to reach this conclusion. Instead, the Court must conclude that Dr. Taylor has not proven that the hospital failed in any obligation it had to him concerning office space.

The evidence here appears to present a classic case of misunderstanding resulting from people with different goals communicating at different levels. However, even after hearing and rehearing Dr. Taylor's testimony, I still find it puzzling why he gave up his North Carolina practice but did not commence the new practice in Tappahannock. It seems he could have made more effort to start his practice in the new location, even if for a time he had to occupy space not altogether satisfactory to him. The reasons stated by him at hearing were not entirely consistent with his statement, quoted above, from his letter of June 10, 1987, withdrawing from the contract. Moreover, it appears that as late as May he was suggesting to the hospital that he delay moving to Tappahannock until October. [Debtor's Exhibit 2.]

Thus, while one inference to be drawn from the evidence is that Dr. Taylor was unable to locate reasonably adequate office space, another inference is that he withheld the commencement of his practice until he learned whether he would be given staff privileges in gastroenterology; when he was denied privileges in this subspecialty he changed his mind about moving to Tappahannock.

In summary, the Court concludes that Dr. Taylor has not proven his claim by a preponderance of the evidence. The Court finds that his failure to relocate and commence medical practice precludes any recovery under the contract.

The decision reached here is regrettable since it does appear that Dr. Taylor, in reliance upon the agreement, gave up his previous medical practice and expended significant time and money for which he is not to be compensated. I can only conclude that Dr. Taylor had a fundamental misunderstanding of his obligations under the agreement.

A separate order will be issued sustaining the debtor's objection to Dr. Taylor's claim and denying the claim.